UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
JAIME GREEN,                         :
                        Plaintiff,   :
                                     :      06 Civ. 5568 (DLC)
             -v-                     :
                                     :      OPINION AND ORDER
MICHAEL J. ASTRUE,                   :
Commissioner of Social Security,     :
                                     :
                        Defendant.   :
------------------------------------ X

Appearances:

For Plaintiff:
James M. Baker, Of Counsel
Center for Disability Advocacy Rights, Inc.
841 Broadway, Suite 605
New York, NY 10003

For Defendant Michael J. Astrue, Commissioner of Social
Security:
Michael J. Garcia
United States Attorney
Leslie A. Ramirez-Fisher
Assistant United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007


DENISE COTE, District Judge:

     Plaintiff Jaime Green ("Green") brings this action pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of a

final decision of defendant Commissioner of Social Security

("Commissioner"), which denied in part and granted in part her

application for Supplemental Security Income ("SSI") benefits.

Green suffers from epilepsy and contends that she is entitled to

disability payments for the period since 1994, when she was eleven or twelve years old.  The administrative law judge ("ALJ") found that she qualified for benefits only for a period of slightly over a year, from May 7, 1996 to August 19, 1997, when she was thirteen and fourteen years old.

The Commissioner has filed a motion for a remand pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Commissioner admits that the ALJ erred by rejecting, without proper development of the record, a treating physician's findings that the plaintiff had significant cognitive defects that could affect her ability to follow a medication regimen.  Green has filed a cross-motion for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P., or in the alternative, for a remand of Green's claim for a new hearing, an award of interim benefits, and the imposition of time limits on the remanded proceedings.  For the reasons set forth below, the portions of the March 26, 2004 ALJ decision denying a claim for benefits for the period following September 6, 2000 is vacated and remanded for a new hearing.


BACKGROUND

The following facts are taken from the administrative record.  Green was born on September 6, 1982, and has suffered from epilepsy since the age of nine.  She attended school

through part of twelfth grade.  She alleges that she is disabled
due to a seizure disorder.

I. Procedural History

     Green's mother first filed an application for SSI benefits
on Green's behalf on August 1, 1994, when Green was eleven years
old.  She alleged disability because of a seizure disorder.  A
hearing was held before ALJ Susan L. Biro on May 7, 1996.
Following a change in the governing regulations, a second
hearing was held on August 19, 1997, when Green was fourteen
years old, before ALJ Allan T. O'Sullivan.  Following exhaustion
of administrative appeals, ALJ O'Sullivan's decision denying
Green's 1994 application became final on July 15, 2000.  Green,
acting through her mother, brought an action for judicial review
in this Court on September 8, 2000.  Adopting a report and
recommendation by Magistrate Judge Frank Maas ("2002 Report"),
the Honorable William Pauley vacated the hearing decision for
lack of substantial evidence and remanded the case to the SSA on
September 27, 2002.  See Green ex rel. Green v. Barnhart, 2002
WL 2022423, No. 00 Civ. 6775(WHP)(FM) (S.D.N.Y. Aug. 30, 2002).

     On March 30, 2004, following a hearing on October 23, 2003,
ALJ Paul A. Heyman determined that Green was disabled, due to
major motor seizures, only from May 7, 1996 to August 19, 1997.
On May 24, 2006, the Appeals Council declined review, making ALJ

Heyman's decision final.  Green filed the instant action on July 24, 2006, appealing ALJ Heyman's denial of benefits for the periods of July 5, 1994 through May 6, 1996 and August 19, 1997 to the present.

II.  Medical Record for Child Disability Benefits

Green first experienced a seizure in January 1992, when she was nine years old.  She was prescribed an anticonvulsive medication.  Green did not consistently take the prescribed doses of this medication,[1] and she experienced at least five grand mal or major seizures, also called general tonic-clonic seizures ("GTC seizures"), between January 1992 and May 1994.  On August 1, 1994, Green's mother applied for disability benefits for her daughter due to the seizures.

From 1994 until her second administrative hearing, in 1997, Green experienced major (GTC) and minor ("absence") seizures of varying frequency.  She obtained medical care primarily through Emergency Room ("ER") visits and was prescribed anticonvulsive medications.  At some point during 1995, Green was having seizures every two weeks.  This was an increase from previous years and may have been caused by her mistakenly combining two

---

[1] Although the record reflects that Green did not faithfully take prescribed anti-seizure medication during certain periods of her childhood and adolescence, that failure cannot properly be attributed to a minor and the record does not explain the reasons for her lack of compliance with her treatment regimen.

different anticonvulsive medications.  Green's history of
seizures and medical treatment during this period is summarized
thoroughly the 2002 Report.  Green, 2002 WL 2022423, at *1-5.
Familiarity with that report is presumed.

At Green's May 1996 hearing before ALJ Biro, Green's mother
testified that Green would get "seizure attacks" "every day" in
the previous year and that she had had seven (presumably major)
seizures in the six or seven months since she had begun taking
the anticonvulsive drug Depakote, including four seizures in
January and February 1996, but no major seizures since February.
Dr. Robert Berk ("Dr. Berk"), an SSA consulting pediatrician,
testified (based on his observation of Green's and her mother's
hearing testimony and several questions he asked Green's mother
at the hearing) that Green's seizure disorder did not meet or
equal a listed impairment.  He also testified that he saw no
evidence of "a medical condition effecting a cognitive
impairment."  He stated that the seizure disorder had a less
than moderate effect on her motor and social functioning, and
the seizures were moderately controlled with a minimal amount of
interruption of function.

In August 1997, Dr. Babra Saeed ("Dr. Saeed"), who had
treated Green, completed a form titled "SSI Child's
Medical/Functional Assessment," which was later submitted to the
SSA.  Dr. Saeed reported that Green's last admission for a

seizure had been in March, and that Green had made at least
thirty ER visits since January 1992.  Dr. Saeed indicated that
an electroencephalogram ("EEG") in March 1997 returned a normal
result.  She also reported that Green was experiencing one to
two months between seizures, and that she was taking Depakote,
which caused unpleasant side effects.

Between August 1997 and June 1999, Green's records show
little to no indication of any medical treatment.  Green became
pregnant at age sixteen and gave birth in February 2000, at age
seventeen.  When she gave birth, she reported to hospital staff
that she had last had a seizure when she was fourteen, which
would have been in 1996 or 1997.  Green does not contend that
she took medication as prescribed for at least three months
during any of the periods in which she experienced significant
seizure activity.

III. Medical Record For Adult Disability Benefits

The evidence about Green's adult medical history is based
on ALJ Heyman's summary of her unrecorded testimony at the
October 23, 2003 post-remand hearing, recorded testimony from
that hearing, and medical reports and evaluations that are part
of the administrative record.  Green's medical records show that
she went to the ER several times in 2000 and 2001 following GTC
seizures or symptoms that she reported to be similar to those

occurring at the onset of a GTC seizure.  She reported that she had not taken her anticonvulsive medication for anywhere from one day to one month prior to the ER visits.  Medical records from May 1, 2002 reflect that Green complained of poor memory and monthly GTC seizures.  In November 2002, Green began treatment with Dr. Felise[2] Milan.  Dr. Milan's treating notes describe Green as suffering from both GTC seizures and absence seizures.  Green reported to Dr. Milan that she had been forgetting to take her medication.

Dr. Milan reported in a January 9, 2003 letter, submitted to the SSA, that Green had a "very poorly controlled" seizure disorder.  She was unaware of any formal testing of Green's cognitive function but opined that Green appeared to have significant cognitive deficits, such as "low IQ," and possibly attention deficit problems.  She concluded that "she would not be able to work at present and may not be able to sustain useful work in the future."

During a January 13, 2003 visit to the Montefiore Hospital Epilepsy Clinic, Green complained of weekly GTC seizures, multiple absence seizures per week, and memory loss.  A January 16 EEG returned a result of normal.  Roughly one week later, Green returned to the ER after running out of medication.  She

---

[2] Various spellings of Dr. Milan's name are recorded in the records.

attended a follow-up visit with Dr. Milan in April 2003, where she reported continued staring spells, a recent GTC seizure, and memory problems.

At the post-remand hearing before ALJ Heyman on October 23, 2003, Green testified that she had not experienced any GTC seizures at work, but that she had had absence seizures daily for an undetermined number of years.  She testified that she had last had a GTC seizure during the month of the hearing.  She described problems remembering to take her medication.  She also said she suffered from depression and had sought a psychiatric consultation but had not yet begun any psychiatric treatment.

Dr. Gerald Galst, a board-certified internist who had not previously met Green, testified as a medical expert at the 2003 ALJ hearing.  After noting that Green had received several "normal" EEG results and that one abnormal result had been "alluded to" at the hearing,[3] he opined that the documentation of staring spells was "at best, very sketchy and not solidly supported by any objective data."  He conceded that some patients who experience seizures have normal EEG results, and that others may have abnormal results only during seizures.  He also highlighted the possibility that Green was failing to take prescribed medication and noted a lack of psychological or

---

[3] In response to the plaintiff attorney's questions, Galst indicated that EEG results measure brain activity during the testing period, rather than before or after.

psychiatric evaluations or treatment.  He urged the ALJ to explore the issue of whether Green might have a cognitive impairment that might explain her failures to take prescribed medication.  Following Dr. Galst's testimony, at the request of Green's attorney, the ALJ agreed to send Green out for psychiatric and psychological testing.  The ALJ, however, never ordered these tests.

Additional documentation submitted following the 2003 hearing shows that Green experienced additional GTC and absence seizures, including at least one GTC seizure that coincided with a failure to take medication.  In an affirmation dated January 2004, Dr. Milan reported that the frequency of Green's GTC seizures varied from once per week to once per month, and that her absence seizures occurred several times per day to several times per week.  Dr. Milan also stated that Green had significant cognitive deficits that affected her ability to maintain compliance with her medication.  Dr. Milan believed that perfect compliance would reduce the incidence of both types of seizures, but doubted that it would reduce the frequency of the minor motor seizures to less than once per week.  In Dr. Milan's medical opinion, Green was "unable to work or even care for herself independently," and she might remain disabled even "with substantially improved compliance."  Green does not contend that she took medication as prescribed for at least

three months during any of the adult periods in which she experienced significant seizure activity.

IV. Plaintiff's Work and Educational History

Between 1998 and 2002, Green worked briefly at a fast-food restaurant, as a telephone customer service representative, and as a cashier and floor worker at a shoe store.  The Commissioner does not contend that her work during any of these years disqualifies her from receiving SSI benefits.  Green testified at the October 2003 hearing that she did not experience major seizures during work hours but did experience absence seizures. She was fired from two jobs for performance reasons, on the grounds that her work was too slow, that she would have absence spells while dealing with customers, and that she was too frequently absent from work.

Green attended some classes to obtain a general equivalency diploma but did not complete the program because she was experiencing absence seizures and feared major seizures.  She also testified that she was absent from many classes and would fall asleep during class as a result of her medication.  She testified that she lived with her sister, who took care of her and her three-year-old child.

DISCUSSION

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is not supported by substantial evidence. Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir. 2007). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A district court may not "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

Before addressing the issues raised by the lengthy record in this case, it is useful to describe the legal framework for the issues. The legal standards for analyzing claims of SSI disability due to seizure disorders are described first. Because the ALJ rejected Green's description of the frequency of her seizures as incredible, the standards for credibility determinations are also described.

I. Disability in Claimants Under Age 18

11

Where a claimant is under eighteen years of age (a "child claimant"), a finding of disability will be made if he can demonstrate that he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(i)).  The Commissioner follows a three-step process in assessing a child's disability claim.  See Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 84-85 (2d Cir. 2003); 20 C.F.R. § 416.924(a).

If, as the parties here seem to agree, the child claimant suffers a severe impairment, in the third step the Commissioner must determine whether the impairment meets or, alone or in combination with another listed impairment, "medically equals, or functionally equals the listings."[4]  20 C.F.R. § 416.924(d); see Encarnacion, 331 F.3d at 84.  A child's impairment or combination of impairments is medically equal to a listed

---

[4] 2001 amendments to SSA regulations eliminated "medical equivalence proceedings" and required that all children be analyzed under a "functional equivalence rubric."  Encarnacion, 331 F.3d at 84 n.3 (citing Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed.Reg. 54,747, 54,755 (Sept. 11, 2000) (codified at 20 C.F.R. Part 416)).  Neither party contends that the changes are material to this decision.

impairment if it is "at least equal in severity and duration."
Id. § 416.926(a) (2000).[5]  It is not necessary to discuss
functional equivalence here, as Green abandoned any claim that
she had an impairment that functionally equaled a listed
impairment in a brief in her first district court action and
does not press such an argument here.


II. Disability in Adults

        The Commissioner must find an adult claimant disabled if
the claimant is "unable to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
that has lasted or can be expected to last for a continuous
period of not less than twelve months."  42 U.S.C. §
1382c(a)(3)(B).  The claimant's impairments must be

        of such severity that he is not only unable to do his
        previous work but cannot, considering his age, education,
        and work experience, engage in any other kind of
        substantial gainful work which exists in the national
        economy, regardless of whether such work exists in the
        immediate area in which he lives, or whether a specific job
        vacancy exists for him, or whether he would be hired if he
        applied for work.  For purposes of the preceding sentence

_____

[5] The regulation defining medical equivalence was amended
effective March 2006, June 2000, and March and February 1997,
but the concept of medical equivalence described above has not
changed in a way material to this Opinion.  See 20 C.F.R. §
416.926(a) (2006); 20 C.F.R. § 416.926(a) (1996); 71 Fed.Reg.
16469l (Mar. 31, 2006); 65 Fed.Reg. 13538 (June 1, 2000); 62
Fed.Reg. 34959 (Mar. 21, 1997); 62 Fed.Reg. 6424 (Feb. 11,
1997).

(with respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers in either the region where such individual lives,
or in several regions of the country.

Id. The disability must be "demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." Id.

§ 1382c(a)(3)(G).

The Commissioner uses a five-step process when making adult

disability determinations. See 20 C.F.R. § 416.920. The Second

Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. Where
> the claimant is not, the Commissioner next considers
> whether the claimant has a "severe impairment" that
> significantly limits her physical or mental ability to do
> basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on
> medical evidence, the claimant has an impairment that is
> listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.
> Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's
> severe impairment, she has the residual functional capacity
> to perform her past work. Finally, if the claimant is
> unable to perform her past work, the burden then shifts to
> the Commissioner to determine whether there is other work
> which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003)

(citation omitted). At the third step, if the claimant's

impairment does not meet all the criteria of a listing, the

Commissioner considers whether the claimaint's impairment or

combination of impairments medically equals a listed impairment.

See 20 C.F.R. §§ 416.926 (medical equivalence); 416.923

(multiple impairments). Medical equivalence is defined in the

same manner for adults as for children.  See id. § 416.926.  A

claimant bears the burden of proof as to the first four steps,

while the Commissioner bears the burden in the final step.

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).


III.  Listed Impairment

        The regulations that describe listed impairments include

the following description of epileptic disorders:


                11.00 Neurological[6]

        A. Epilepsy.  In epilepsy, regardless of etiology,
        degree of impairment will be determined according to
        type, frequency, duration, and sequelae of seizures.
        At least one detailed description of a typical seizure
        is required.  Such description includes the presence
        or absence of aura, tongue bites, sphincter control,
        injuries associated with the attack, and postictal[7]
        phenomena.  The reporting physician should indicate

_____

[6] These excerpts are taken from the current version of the Code
of Federal Regulations, which is the same in all material
respects as the version in effect at the time of the 2003 ALJ
hearing.  The most recent substantive amendment to the listing
criteria for epilepsy occurred on April 24, 2002, effective May
24, 2002.  In addition to other changes not material to this
Opinion, the 2002 rulemaking removed from all epilepsy listings
except that for nonconvulsive childhood epilepsy the requirement
that epilepsy be documented by at least one EEG.  Technical
Revisions to Medical Criteria for Determinations of
Disability, 67 Fed.Reg. 20018, 20,019-20,020 (Apr. 24, 2002)
(codified at 20 C.F.R. pt. 404, subpt. P, app. 1).  Neither the
Commissioner nor the ALJ has contended that Green fails to meet
the listing criteria due to any dearth of EEGs.

[7] The term "postictal" means "occurring after a sudden attack (as
of epilepsy)."  National Institutes of Health, MedlinePlus
Medical Dictionary, http://www.nlm.nih.gov/medlineplus
/mplusdictionary.html.

the extent to which description of seizures reflects
his own observations and the source of ancillary
information.  <u>Testimony of persons other than the
claimant is essential for description of type and
frequency of seizures</u> if professional observation is
not available.

Under 11.02 and 11.03, <u>the criteria can be applied
only if the impairment persists despite the fact that
the individual is following prescribed antiepileptic
treatment</u>.  Adherence to prescribed antiepileptic
therapy can ordinarily be determined from objective
clinical findings in the report of the physician
currently providing treatment for epilepsy.
Determination of blood levels of phenytoin sodium or
other antiepileptic drugs may serve to indicate
whether the prescribed medication is being taken.
When seizures are occurring at the frequency stated in
11.02 or 11.03, <u>evaluation of the severity of the
impairment must include consideration of the serum
drug levels</u>.  Should serum drug levels appear
therapeutically inadequate, consideration should be
given as to whether this is caused by individual
idiosyncrasy in absorption of metabolism of the drug.
<u>Blood drug levels should be evaluated in conjunction
with all the other evidence to determine the extent of
compliance</u>.  When the reported blood drug levels are
low, therefore, the information obtained from the
treating source should include the physician's
statement as to why the levels are low and the results
of any relevant diagnostic studies concerning the
blood levels.  Where adequate seizure control is
obtained only with unusually large doses, the
possibility of impairment resulting from the side
effects of this medication must be also assessed. . .
.

<u>11.02 Epilepsy--convulsive epilepsy</u>, (grand mal or
psychomotor), documented by detailed description of a
typical seizure pattern, including all associated
phenomena; <u>occurring more frequently than once a month
in spite of at least 3 months of prescribed treatment</u>.

A. Daytime episodes (loss of consciousness and
convulsive seizures) or

B. Nocturnal episodes manifesting residuals which

interfere significantly with activity during the day.

> 11.03 Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. pt. 404, subpt. P, app. 1 (2007) (emphasis supplied);

see Brown v. Apfel, 714 F.3d 59, 64 (2d Cir. 1999). The

parallel listings for children's seizure disorders -- Listings

111.02 (major seizure disorder) and 111.03 (minor motor

seizures) -- have the same requirements, at least for our

purposes. See 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 111.02,

111.03.

In order to be a "listed" impairment, a condition must meet

all of the elements set out in the definition of a listed

impairment. Sullivan v. Zebley, 493 U.S. 521, 523 (1990);

Brown, 174 F.3d at 64. Thus, with respect to a seizure

disorder, the elements include, among other things, (1) a

detailed description of a typical seizure, including all

associated phenomena; (2) either evidence from a physician or

persons other than the claimant about the type and frequency of

seizures; (3) adherence to antiepileptic drug therapy; and (3)

the occurrence of seizures at a frequency described in the

regulations despite following prescribed treatment for at least

three months.[8]  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.00, 11.02, 11.03, 111.00, 111.02, 111.03.

IV.  Credibility Determinations

An ALJ's findings as to a claimant's credibility are entitled to deference.  The ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility ... may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (citation omitted).  As with any finding of fact, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain" or other symptoms.  Arteaga v. Astrue, No. 06 Civ. 1244(PKC), 2007 WL 2402871, at *16 (S.D.N.Y. Aug. 15, 2007) (citing Aponte v. Sec'y Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).

Conclusory findings, however, will not survive district court review.  An ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the

---

[8] Prior to May 24, 2002, all seizure disorders also had to be documented by at least one EEG, whereas now only nonconvulsive seizure disorder in children has that requirement.

adjudicator gave to the individual's statements and the reasons for that weight." Evaluations of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, Social Security Ruling 96-7p, 61 Fed.Reg. 34,483, 34,484 (July 2, 1996).

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

Id.

Where a claimant has failed to seek medical care or to follow prescribed treatment, those facts may be relevant to determining the reliability of the claimant's description of her symptoms and condition, but only after considering any reasons for that failure. The SSA has observed that a claimant's

> statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first

considering any explanations that the individual may
provide, or other information in the case record, that
may explain infrequent or irregular medical visits or
failure to seek medical treatment.  The adjudicator
may need to recontact the individual or question the
individual at the administrative proceeding in order
to determine whether there are good reasons the
individual does not seek medical treatment or does not
pursue treatment in a consistent manner.  The
explanations provided by the individual may provide
insight into the individual's credibility. For
example:

- The individual's daily activities may be structured
so as to minimize symptoms to a tolerable level or
eliminate them entirely, avoiding physical or mental
stressors that would exacerbate the symptoms.  The
individual may be living with the symptoms, seeing a
medical source only as needed for periodic evaluation
and renewal of medications.

- The individual's symptoms may not be severe enough
to prompt the individual to seek ongoing medical
attention or may be relieved with over-the-counter
medications.

- The individual may not take prescription medication
because the side effects are less tolerable than the
symptoms.

- The individual may be unable to afford treatment and
may not have access to free or low-cost medical
services. . . .

Titles II and XVI:  Evaluation of Symptoms in Disability Claims:

Assessing the Credibility of an Individual's Statements, Social

Security Ruling (SSR) 96-7p, 61 Fed.Reg. 35,583, 34,487 n.6

(July 2, 1996) (emphasis supplied).

V.  The 2004 ALJ Decision

On remand, ALJ Heyman concluded that Green was disabled for about fifteen months during her childhood, but rejected the remainder of her disability claim in a decision dated March 26, 2004.  Regarding Green's claim for childhood disability benefits, the ALJ found that Green's seizure disorder constituted a "medically determinable severe impairment."  He found that from May 7, 1996 through August 19, 1997 only, Green's condition met the criteria of Listing 111.02 (childhood major motor seizures).  For the preceding period, which ran between July 5, 1994 and May 6, 1996, he held that Dr. Berk's testimony provided substantial evidence to support the previous ALJ's finding that Green's seizures had occurred at listing frequency only when she was not consistently taking medication as prescribed.[9]  With respect to the period of her childhood that followed, which ran from August 20, 1997 to September 5, 2000, ALJ Heyman found that "the record demonstrates both that the claimant did not have seizures at the rate that she alleges and that she continued to be noncompliant with her medications."

Regarding Green's claim for adult disability benefits, which concerned the period between September 6, 2000 through

---

[9] In this portion of his opinion, the ALJ relies on his reading of the 2007 Report.  Because the claimant does not take issue with this reading or otherwise make any argument specifically addressed to this period aside from recounting the evidence of seizures, it is unnecessary to discuss this further.

March 2004, the date of the ALJ's decision, the ALJ held that Green was not engaged in substantial gainful activity and that that her seizure disorder was a severe impairment.  He then found that this disorder did not meet or equal the 11.02 Listing (major motor seizures).  He rejected Green's testimony that the frequency of her convulsive seizures had not changed since the previous hearing in 1997 and averaged one episode per month.  He found this testimony inconsistent with Green's testimony that she had not experienced any convulsive seizures while at any of her jobs, the fact that she carried her pregnancy to term, her medical treatment record, and her failure to take prescribed medications.[10]  Based upon the evidence that Green had failed to take these medications over long periods of time, had never sought treatment for cognitive problems, and had provided no other records of cognitive impairment, the ALJ rejected Dr. Milan's conclusion that this failure resulted from a cognitive deficit.  He stated, however, that "non-compliance is not the reason for finding that the claimant does not meet the Listing," and that "the reason is that the claimant has convulsive seizures less frequently than she alleges and that the frequency of her seizures does not meet the listing criteria."

---

[10] He also noted that, despite being represented by counsel at the time, neither Green nor her mother kept contemporaneous records of her adult seizures.

He next found that Green's adult absence seizures did not satisfy the criteria for Listing 11.03 (minor motor seizures), because the medical records did not support her testimony that she experienced such seizures twice daily.  He found that her minor seizures were largely attributable to Green's failure to take prescribed medications but stated that non-compliance was not the reason for finding that Green's seizures did not satisfy the criteria of Listing 11.03.  Rather, he based his finding that Green did not meet Listing 11.03 on his conclusion that Green did not have absence seizures at the required frequency. Proceeding to step four of the adult disability analysis, the ALJ found that Green was not disabled because she retained the residual functional capacity to perform a full range of exertional work, without significant non-exertional limitations.

VI.   Commissioner's Motion to Remand and Green's Cross-Motion
      for Judgment on the Pleadings

Green principally argues that the Court should award her all denied benefits.  She admits that the record regarding her major seizure disorder is equivocal, but contends that the record of the minor motor seizures is compelling.

Reversal of an ALJ's denial of benefits and an award of benefits are appropriate only where the administrative record contains "persuasive evidence of total disability" that would render any further proceedings "pointless."  Williams v.

Apfel, 204 F.3d 48, 50 (2d Cir. 1999).  Entry of judgment in

Green's favor and an award of benefits is not appropriate.

Green concedes that she "may not technically 'meet' Listings

11.02 or 11.03," which describe adult seizure disorders,

"because of the requirement that seizures occur 'in spite of at

least 3 months of prescribed treatment.'"[11]  She makes no

argument specifically addressed to her entitlement to benefits

as a child claimant and does not contend that she experienced

seizures at a rate required to meet a listing despite complying

with medical treatment for three months at any period during her

childhood.

     The parties agree that ALJ Heyman failed fully to develop

the record on the issue of cognitive impairment, despite his

commitment to gather more information.  The Commissioner

requests a remand in order to remedy this omission.  The

Commissioner concedes that the ALJ had a duty to order

psychiatric and psychological evaluations of Green and to

recontact Dr. Milan to determine if she could provide additional

information to support her assertion that Green suffered from a

significant a cognitive impairment that could have affected her

---

[11] Green refers cryptically in a footnote to the possibility that
this deficiency may be overcome either through some undescribed
finding that her condition medically equals a listing or because
she is entitled to benefits based on vocational factors.
Because Green does not explain these alternatives sufficiently,
they will not be further addressed.

ability regularly to take prescribed medication.  See 20 C.F.R.
§ 416.912(e)(1) (ALJ's duty to recontact treating physician);[12]
Rosa, 168 F.3d at 79-80.

While the parties discuss the duty of an ALJ to develop the
record, the Commissioner does not explain precisely why such an
analysis of Green's cognition is relevant to the ultimate issue
of disability.  Green's application for benefits is based solely
on epilepsy.  Since the ALJ explicitly refused to rest the
denial of adult benefits on Green's failure to take at least
three months of medication, the extent to which any cognitive
impairment affected her compliance with medical treatment is not
relevant to the "three-months-of-medication" requirement.[13]  As
described below, however, Green's level of cognitive impairment,

---

[12] This section reads,

[W]hen the evidence we receive from your treating physician . .
. or other medical source is inadequate for us to determine
whether you are disabled, . . . we will first recontact your
treating physician . . . or other medical source to determine
whether the additional information we need is readily available.

20 C.F.R. § 416.912 (e)(1).

[13] Green argues repeatedly in her brief that there are several
limitations on an ALJ's ability to reject a claim for the
failure to follow prescribed treatment.  She points out that the
ALJ should not be allowed to circumvent these limitations by
asserting on one hand that the denial is not based on a
claimant's lack of compliance with treatment, but on the other
hand considering that non-compliance in another part of the
disability analysis.  The law set forth above provides guidance
for the appropriate use of evidence that a claimant has not
complied with treatment when judging her credibility in
describing the severity of her condition.

if any, may be relevant to the credibility assessment the ALJ
made when assessing Green's report about the frequency and
severity of her attacks.  As a consequence, the application for
benefits for the period following September 5, 2000 will be
remanded.

     A.   Childhood Periods

       1.   July 5, 1994 to May 6, 1996

The parties' briefing focuses primarily on issues pertinent
to the adult period, after Green began treatment with Dr. Milan.
Green nevertheless argues that a large number of records from
the period July 5, 1994 to May 6, 1996 refer to major seizures,
and that a medical record from May 15, 1995 documents two to
three minor seizures per day.  Green is not able to point to
evidence, however, that these seizures occurred despite three
months of prescribed treatment.  Moreover, during the 1996
hearing, consulting pediatrician Dr. Robert Berk testified about
the efficacy of Green's prescribed medication.  As a result, ALJ
Heyman had substantial evidence for finding that Green failed to
meet the seizure listings.

Understandably, Green has not argued that her cognitive
impairment is relevant to an award of benefits for this period
of her childhood.  Since her mother appears to have been
responsible for administering her medication during this period,

any cognitive impairment from which Green may have suffered should not have affected her adherence to a treatment regimen. As a consequence, Green has not shown, and this Court cannot find, any reason to reverse the ALJ's finding with respect to this period or to remand this portion of the application for benefits for further proceedings.

> 2.   August 20, 1997 – September 5, 2000

With respect to the time period covering the end of Green's adolescence, the medical records do not provide evidence of any seizures.  A February 2000 medical record reports Green's statements that her "last episode" occurred at age fourteen, which would have been prior to September 6, 1997.  Green's vague and uncorroborated statement at the 2003 hearing -- "that she's had absence seizures two times a day pretty much consistently for the past – well [an] undetermined number of years" -- is insufficient to require either a reversal or remand.  The ALJ's finding that Green did not have seizures during the 1997-2000 period "at the rate that she alleges" and that her condition did not medically equal a seizure listing during this time period is amply supported by the record.  See SSR 96-7p, 61 Fed.Reg. 34,483, 34,484.  Again, there is no reason to reverse the ALJ's finding for this latter time period during her childhood or to remand for further review.

> B.   Adult Period

In denying the claim for benefits from September 6, 2000 to March 26, 2004, ALJ Heyman referred repeatedly to Green's failure to take medications as prescribed.  While "non-compliance" was not the reason for his finding that Green did not meet either the major or minor motor seizure listing, it weighed heavily in his conclusion that Green was not credible in her report that she suffered frequent major motor seizures and twice-daily absence seizures.[14]  Here, where the parties agree that the ALJ failed adequately to develop evidence of cognitive impairment -- an issue which may shed light on the reasons Green failed to take her medication -- it is appropriate to remand the claim for adult benefits.

On remand, after developing evidence of cognitive impairment in the manner that the Commissioner has suggested, the ALJ should consider the credibility guidelines in Social Security Ruling 96-7p, in particular the reasons for any "non-compliance."  Based on that analysis, the ALJ may also find it appropriate to consider whether Green's major and minor seizures

---

[14] There is no need to consider Green's argument that the ALJ could not have denied benefits pursuant to SSR 82-59 and 20 C.F.R. § 416.930, which address failure to follow prescribed treatment by claimants who have already been found disabled. See, e.g., Zervas v. Barnhart, No. 05 Civ. 2133, 2007 WL 1229312, at *4 (E.D.N.Y. Apr. 26, 2007).  The present review considers only the ALJ's actual analysis, which did not reach the issues covered in those sections.

might combine to medically equal the criteria for either seizure Listing.

VII. Interim Benefits

Green has sought interim benefits pursuant to the Court's inherent power.  See Day v. Schweiker, 685 F.2d 19, 24 (2d Cir. 1982), rev'd on other grounds, Heckler v. Day, 467 U.S. 104 (1984).  In the absence of a finding that Green is currently disabled, an award of interim benefits is denied.  See Butts v. Barnhart, 416 F.3d 101, 103-04 (2d Cir. 2005).

The parties do not explain, however, whether Green has already received any of the childhood benefits awarded by ALJ Heyman in 2003.  The parties will be allowed to clarify whether the partial benefits previously awarded have been paid and in the event that they were not, whether a further delay in payment is appropriate.


VIII. Time Limits

Green argues that if the case is remanded for further administrative hearings, then a limit on the amount of time the Commissioner is given for further administrative proceedings should be imposed.  Because the record as it stands does not support a finding of disability, the district court may not set a deadline for an automatic award of benefits.  See Butts, 416 F.3d at 103-04.  The Commissioner will be required, however, to

provide a status letter to this Court within 120 days, and every 30 days thereafter until a decision is rendered on the claim.

CONCLUSION

Green's request for an award of benefits for the period from July 5, 1994 through May 6, 1996 and August 19, 1997 through September 5, 2000 is denied. The Commissioner's motion for remand is granted for a determination of benefits for the period following September 5, 2000. The case is thus remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Opinion. The remainder of Green's motions is denied. No later than October 12, the Commissioner shall provide a report to Chambers regarding payment of benefits for the period from May 7, 1996 through August 19, 1997. The Commissioner is further ordered to provide status letters to this Court according to the schedule described above.

SO ORDERED:

Dated:    New York, New York
          September 14, 2007

                              _____
                                   DENISE COTE
                              United States District Judge

30

COPIES MAILED TO:

James M. Baker
Center For Disability Advocacy Rights
("CEDAR"), Inc.
841 Broadway, Suite 605
New York, NY 10003

Leslie A. Ramirez-Fisher
Assistant U.S. Attorney
86 Chambers Street, 3d Floor
New York, NY 10007